481 So.2d 1022 (1985)
Milton MARSHALL
v.
BENO TRUCK EQUIPMENT, INC., et al.
No. 84 CA 0578.
Court of Appeal of Louisiana, First Circuit.
June 25, 1985.
On Rehearing December 11, 1985.
January 15, 1986.
Writs Denied February 7, 1986.
*1025 Dan C. Garner and John G. Munoz, New Orleans, for plaintiff-appellee Milton Marshall.
James W. Hailey and Andrew L. Hemlin, Metairie, for intervenor-appellee Maryland Cas. Ins. Co.
Stanley Loeb, New Orleans, for third party defendant-appellee Maryland Cas. Ins. Co.
Donald R. Smith, Baton Rouge, for defendant-appellee Beno Truck Equipment, Inc., Beno Crane Rental, Inc.
Dean A. Sutherland, New Orleans, for defendant-appellant Hartford Acc. Indem. Co. and Heil Co.
Lucas Giordano, New Orleans, for defendant-appellee Southern American.
John S. White, Jr., Baton Rouge, for defendant-appellee Leasing Service, Inc.
Edwin W. Fleshman, Baton Rouge, for defendant-appellee The Travelers Ins. Co. and its' insured Beno Truck Equipment Inc.
William A. Norfolk, Baton Rouge, for defendant-appellee Beno Truck Equipment Inc.
Before COLE, CARTER and LANIER, JJ.
Per Curiam January 15, 1986.
CARTER, Judge.
This matter comes before us on an appeal taken by defendants, The Heil Company (Heil) and Hartford Accident & Indemnity *1026 Company (Hartford), Heil's liability insurer, from a jury verdict finding defendants solely liable for damages suffered by plaintiff, Milton Marshall, as a result of a work-related accident.

FACTS
On August 31, 1978, the date of the accident, Marshall was employed by Thomas Heard Construction Company as a mechanic. Plaintiff was twenty-two years old at the time, had a ninth grade education, and had eight years of experience as a mechanic.
The day before the accident, a dump truck belonging to Thomas Heard Construction Company became bogged in a muddy construction site on Airline Highway near State Police Troop A. In the process of freeing the bogged truck, the truck's differential gear, which is located on the rear axle of the truck, broke. Plaintiff arrived at the scene the next day to repair the truck. At the time, the "dump bed" was in a raised position. Plaintiff removed the differential gear from the truck, brought it back to the shop for repair, and then returned to the construction site with the repaired gear.
Plaintiff placed the differential gear in its proper position on the rear axle with the help of R.T. Turner, a co-worker. Plaintiff positioned himself so that he was sitting on a cross-bar of the chassis underneath the raised dump bed with his back toward the cab of the truck and his knees supporting the differential gear in place. Turner walked away from the truck as plaintiff was finishing the repair job. Plaintiff was bent over the differential gear bolting it to the axle when he suddenly felt pressure on his shoulders. Pinned between the dump bed and the rear axle, plaintiff was crushed as the dump bed continued to lower itself. Turner, hearing the commotion, ran back to the truck, jumped into the cab, and activated a mechanism to raise the dump bed. The engine of the truck was not running at any point during this incident.
As a result of this accident, plaintiff suffered severe and permanent injuries, requiring four extended hospital stays and three surgeries.
On August 29, 1979, plaintiff filed suit in the Nineteenth Judicial District Court against Beno Truck Equipment, Inc. (Beno Truck), Beno's Crane Rental, Inc., and Leasing Services, Inc. All of these defendants are Louisiana corporations. On August 31, 1979, plaintiff filed suit on this same cause of action in the U.S. District Court for the Eastern District of Louisiana against Heil, Peabody-Gallion Corporation, and Garwood Company, foreign corporations or foreign business entities.
Heil was served with the federal suit through the Louisiana Secretary of State on September 6, 1979. Heil was added as a party defendant in the state court action on September 30, 1980. Other defendants were named in the state court action subsequent to the petition being filed, and various third-party demands were made by the litigants. By way of voluntary dismissals and directed verdicts, all defendants except Beno Truck, Heil, and Hartford, were dismissed from the state suit.
Heil filed a motion to dismiss the federal suit on jurisdictional grounds. Plaintiff, through his attorney, subsequently filed a "Motion for Voluntary Dismissal" in the federal court action. On November 25, 1981, plaintiff's motion was granted, and the federal suit was dismissed.
The state court action proceeded to trial. The jury reached the conclusion that Beno Truck was not at fault, that plaintiff was not contributorily negligent, and that Heil was solely liable for plaintiff's injuries. A formal judgment on that verdict was signed on November 4, 1983. From that judgment, Heil and Hartford appeal, assigning the following specifications of error:[1]

*1027 1. Permitting the jury to consider the financial condition of defendant, Beno Truck, was prejudicial reversible error.
2. The jury's finding that Beno Truck was not at fault was manifestly erroneous.
3. The trial judge erred in permitting questions on the subject of "recall."
4. The trial judge erred in permitting testimony and evidence concerning standards which did not apply to dump trucks and were mentioned for the first time during trial.
5. The jury's finding that Heil was at fault was manifestly erroneous.
6. The jury's finding that Marshall was not contributorily negligent was manifestly erroneous.
7. The jury's award of $1,150,000.00 in damages was excessive and constituted an abuse of the jury's discretion.
8. The trial judge erred in denying the Heil's exception of prescription.

SPECIFICATION OF ERROR NO. 1
The "inability to pay" rule in Louisiana allowing a defendant to assert evidence of his impecunious condition at the time of trial was one of longstanding. Williams v. McManus, 38 La.Ann. 161 (1886); Loyacano v. Jurgens, 50 La.Ann. 441, 23 So. 717 (1898). In the past, it was proper to consider the defendant's inability to pay a judgment in assessing damages. Guy v. Tonglet, 379 So.2d 744 (La.1980); Daly v. Kiel, 106 La. 170, 30 So. 254 (1901); Tarver v. U-Haul Company, Inc., 362 So.2d 1157 (La.App. 2nd Cir.1978).
However, the Louisiana Supreme Court declared the "inability to pay" rule is no longer applicable in Louisiana Courts in the recent case of Rodriguez v. Traylor, 468 So.2d 1186 (La.1985). In reversing nearly one hundred years of jurisprudence, the Court stated:
The inability to pay rule originated in Williams v. McManus, 38 La.Ann. 161 (1886) and Loyacanno v. Jurgens, [50 La.Ann. 441], 23 So. 717 (1898) and has been applied by Louisiana courts ever since. The rationale for this jurisprudentially created rule is found in Cole v. Sherill, 7 So.2d 205 (La.App. 2d Cir. 1942):
It has never been good policy to bankrupt one to pay another even though the award granted is not in line with other cases involving the same injuries and might not fully compensate the plaintiff for injuries he received. Fair justice between both parties must be arrived at. (7 So.2d at 211).
While the inability to pay rule has been applied by the courts of this state, it has not gone unquestioned. In Davis v. Moore, 353 So.2d 740 (La.App. 4th Cir. 1978), in concurring opinions by Judge, now Associate Justice Lemmon of this Court and Judge Boutall, termination of the inability to pay rule was advocated. Moreover, in Daniels v. Conn, 382 So.2d 945 (La.1980) this court restricted the use of inability to pay rule by preventing its application to joint tortfeasors where one joint tortfeasor was solvent. While Louisiana has begun to restrict the inability to pay doctrine, other jurisdictions have never sanctioned its use. In Laidlaw v. Sage, 158 N.Y. 73, 52 N.E. 679 (App.Div. 1899), the court stated:
It has ever been the theory of our government, and a cardinal principal of our jurisprudence, that the rich and poor stand alike in courts of justice, and neither the wealth of one nor the poverty of the other shall be permitted to affect the administration of the law.
See also Chilvers v. New York Magazine Company, 114 Misc.2d 996, 453 N.Y.S.2d 153 (1982); Taulborg v. Andresen, 119 Neb. 273, 228 N.W. 528 (1930); Singles v. Union Pacific Railroad Company, 174 Neb. 816, 119 N.W.2d 680 (1963); Lutz Industries v. Dixie Home Stores, 242 N.C. 332, 88 S.E.2d 333 (1955); Watson v. White, 309 N.C. 498, 308 S.E.2d 268 (1983); Story v. Green, 164 Cal. 768, 130 P. 870 (1913); Allard v. La. Plain, 125 Me. 44, 130 A. 737 (1925); Jones & Adams v. George, 227 Ill. 64, 81 N.E. 4 (1907). While we are hesitant to overrule a longstanding jurisprudential rule, *1028 after careful consideration, we feel that the wealth or poverty of a party to a lawsuit is not a proper consideration in the determination of compensatory damages. Each litigant should stand equal in the eyes of the law regardless of his financial standing. When the inability to pay rule originated in this State there were no bankruptcy laws in effect and a defendant was subject to losing virtually everything he owned. While the policy behind the inability to pay rule, to prevent the bankruptcy of a defendant, is still a valid concern, with todays modern bankruptcy courts and extensive protections to defendants by virtue of the bankruptcy laws, we feel that this is a more proper consideration for bankruptcy courts and experienced bankruptcy judges rather than an jury which has no expertise in the modern day protections for those who are forced to declare bankruptcy. See La.R.S. 13:3881. We therefore conclude that the trial court should not have permitted the jury to hear evidence of the defendant's inability to pay.
In the case sub judice, Beno Truck was allowed, over objection, to introduce evidence of its financial condition and its liability insurance policy with limits of $100,000.00. Al Cortelloni, President of Beno Truck, testified that he had almost sold Beno Truck for $800,000.00 recently, but that with the debts of the company taken into consideration, it was worth "nothing." This evidence is inadmissible under the holding in Rodriguez, supra.
Heil contends that the jury was influenced in its assessment of liability by the evidence of Beno Truck's insolvency. Heil reasons it was held solely liable because the jury awarded a substantial sum for plaintiff's damages and wanted to be certain that the party or parties cast in judgment could afford to pay the award. In support of this contention, Heil relies on the following colloquy between the judge and jury foreman during deliberations:
THE COURT: Do you have a question?
THE FOREMAN: Yes. We have a question that we can't getone defendant to be more negligent than the other, is it possible in this lawsuit?
THE COURT: No, sir.
THE FOREMAN: Its got to be all the way one way?
THE COURT: Yes, sir. Yes, sir. We All right. We now have, just as history, we now have in this State since 1980, accidents that have happened since 1980, we can apportion percentages, but before 1980, its got to be either, you know, not a little bit negligent, its just you're either negligent or not. That's it. Oaky?
THE FOREMAN: That's whatThat's what we needed to know.
THE COURT: Thank you very much.
Although we cannot determine whether the jury was influenced by evidence of the defendant's inability to pay, we must conclude that the trial court committed reversible error in permitting the jury to hear such evidence, especially before the issue of liability is decided.[2]Rodriguez v. Traylor, supra.
The record does not provide a clear answer to the question of liability. The testimony and evidence is in conflict as to whether the injury was caused by a defective design of a hydraulic system on the part of Heil or the defective installation of that system by Beno Truck. There is also an unmistakable preponderance of evidence as to plaintiff's contributory negligence or lack thereof. A view of the witnesses is essential to a fair resolution of this conflicting evidence, therefore, this case is remanded for a new trial. Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La.1980); Dawson v. Mazda Motors of America, Inc., et al, 475 So.2d 372 (La. App. 1st Cir.1985).
*1029 Because of our ruling on Specification of Error No. 1, we find it unnecessary to consider the other issues raised on appeal.[3]

CONCLUSION
For the above reasons, the judgment of the trial court is reversed, and the case is remanded to the trial court for proceedings consistent with the views expressed herein. Costs of this appeal are to await final determination of these proceedings.
REVERSED AND REMANDED.

ON REHEARING
On our original hearing of this matter, we decided the trial court committed reversible error by allowing the jury to consider the financial condition of Beno Truck. This holding was based on the Louisiana Supreme Court's recent decision in Rodrigue v. Traylor, 468 So.2d 1186 (La. 1985). We remanded this matter to the trial court for re-trial, reasoning that the jury's determination that Heil was solely liable for plaintiff's damages could have been influenced by the knowledge that Beno Truck could not respond fully in damages.
In our original hearing, we also noted that plaintiff sued several other defendants; however, we failed to set forth the disposition as to each. Plaintiff originally named Beno's Crane Rental, Inc., Leasing Services, Inc., and Americ, Inc. as defendants. The record contained no return of service on Americ, Inc. Its disposition is not at issue here. Beno's Crane and Leasing Services were given directed verdicts at the close of plaintiff's case, dismissing them from suit. No appeal was taken from these judgments dismissing Beno's Crane and Leasing Services; therefore, they are now final.
All parties have requested this rehearing, with plaintiff and Beno Truck asking that we resolve the matter on the record. Heil requests a rehearing on the issue of prescription.
We, therefore, granted a rehearing on the following issues:
1. Whether this Court should decide the issues on the record or whether the case should be remanded;
2. What standards of review are applicable;
3. Whether Beno Truck is liable to plaintiff for his injuries;
4. Whether Heil is liable to plaintiff for his injuries;
5. Whether the defendants are solidarily liable;
6. Heil's plea of prescription;
7. Heil's third party demand against Beno Truck;
8. Plaintiff's contributory negligence; and,
9. Quantum.

REMAND
As indicated heretofore, the trial court committed numerous prejudicial errors on the admissibility of evidence. However, because Louisiana appellate courts have jurisdiction over facts in civil cases, such prejudicial errors do not necessarily require a remand. Louisiana Constitution Article V, § 10; LSA-C.C.P. art. 2164. Where prejudicial errors (such as those in the instant case) impeach the validity of a jury verdict and the trial court record is complete, an appellate court should, if it can, render a judgment on the record before it. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). In other words, where a finding of fact is interdicted because of some legal error implicit in the fact finding process or when a mistake of law forecloses any finding of fact, and where the record is otherwise complete, the appellate court should, if it can, render judgment on the record. Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La.1980). However, where the weight of evidence is nearly equal and a firsthand view of the witnesses is essential to a fair resolution of conflicting evidence, the case *1030 should be remanded for a new trial. Ragas v. Argonaut Southwest Ins. Co., supra.
Although in our original hearing of this matter, we determined that the record did not provide a clear answer to the question of liability, upon reconsideration we see that there are no significant questions of credibility which require a view of the witnesses. Any conflict in testimony can be resolved by careful independent review of the record.

STANDARDS OF REVIEW
When a jury verdict has been interdicted and a judgment is rendered on the record, an appellate court is not bound by the manifest error (clearly wrong) rule of appellate review of the trial court facts, but is required to make an independent evaluation of the record and determine a preponderance of the evidence. Suhor v. Gusse, 388 So.2d 755 (La.1980); Raiford v. Saia Motor Freight Lines, Inc., 442 So.2d 548 (La.App. 1st Cir.1983), writ denied, 444 So.2d 1242 (La.1984); Bossier v. DeSoto General Hospital, 442 So.2d 485 (La.App. 2nd Cir.1983), writ denied, 443 So.2d 1122 (La.1984). Cf. Thomas v. Missouri Pacific Railroad Co., 466 So.2d 1280 (La.1985) and cases cited therein.
The evidentiary errors in the trial court impeached both the fact finding and the quantum award. Therefore, in the case sub judice, we will make an independent evaluation of the record and determine liability and damages by a preponderance of the evidence.

LIABILITY
Generally, a manufacturer is liable for injuries caused by the defective products it manufactures when such injuries are caused by the product's defective qualities and occur in the normal use or application of the product. A product is defective when it is unreasonably dangerous in normal use. In Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978), the Louisiana Supreme Court held that, "when the danger is known to the manufacturer and cannot justifiably be expected to be within the knowledge of users generally, the manufacturer must take reasonable steps to warn the user." Id. at 930 (emphasis added). This duty arises out of the manufacturer's actual or constructive knowledge of its product's shortcomings. This duty was later expanded in Cobb v. Insured Lloyds, 387 So.2d 13 (La.App. 3rd Cir.), writ denied, 394 So.2d 615 (La.1980), wherein the court indicated that "normal use" within the parlance of Louisiana Products Liability Law encompasses all intended and foreseeable uses, including reasonably foreseeable misuse, in which the consumer may engage with the product. A product is therefore "defective" if it is unreasonably dangerous in normal use, which includes a failure to warn of a known or reasonably foreseeable danger. Scott v. Black & Decker, Inc., 717 F.2d 251, 253 (5th Cir.1983). In all cases of products liability, including those of failure to warn, a manufacturer is presumed to know of its product's potential hazards. With respect to failure to warn cases, if a product creates an unreasonable risk of harm from foreseeable use or likely misuse and the ordinary user cannot reasonably be expected to appreciate that risk, then a warning is required. Chappuis v. Sears Roebuck & Co., supra. The user must be warned concerning the potential dangers of a product, whether he be the purchaser or not, and it is the user who should be furnished instructions or warnings intended to prevent misuse. Chappuis v. Sears Roebuck & Co., supra; Byrd v. Hunt Tool Shipyard, 650 F.2d 44 (5th Cir.1981).
The manufacturer also has a duty to know all dangerous qualities of the product, whether they be of design, manufacture, composition or failure to warn, and is responsible for making these dangers known to purchasers, or users, even though the product itself is not inherently dangerous. Jowers v. Commercial Union Ins. Co., 435 So.2d 575 (La.App. 3rd Cir. 1983); O'Brien v. Delta Gas, Inc., 426 So.2d 262 (La.App. 4th Cir.1983), writ denied, 433 So.2d 163 (La.1983).
*1031 A products liability action in Louisiana lies in negligence. It is only because of the manufacturer's presumed knowledge of the dangerous propensities of his product that the manufacturer is said to be strictly liable to the plaintiff. Entrevia v. Hood, 427 So.2d 1146, 1149 (La.1983) (citing Hunt v. City Stores, Inc., 387 So.2d 585 (La.1980) as a traditional negligence case); Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982); Smith v. Formica Corp., 439 So.2d 1194 (La.App. 1st Cir. 1983).
In a negligence cause of action, it is the plaintiff's burden to prove that the manufacturer knew, or should have known that its product created an unreasonable risk of harm, while such knowledge is presumed in a products liability case. Brumley v. Firestone Tire & Rubber Co., 459 So.2d 572 (La.App. 3rd Cir.1984). In a strict products liability suit, it is not required that the plaintiff establish that the manufacturer has been negligent in the design or manufacture of the product. The claimant is required to prove merely the existence of a defect, and the causal link between that defect and the injuries complained of. DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La.1981), reversed and remanded, on remand 410 So.2d 279 (La.App. 4th Cir.1982), writs denied, 412 So.2d 1097, 427 So.2d 1208; Weber v. Fidelity & Casualty Insurance Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971); Llewellyn v. Lookout Saddle Company, 315 So.2d 69 (La.App. 2nd Cir.1975). The major distinction between the two theories of recovery lies in the fact that the inability of a defendant to know or prevent a risk is not a defense in a strict liability case but precludes a finding of negligence. Entrevia v. Hood, supra; Hunt v. City Stores, Inc., supra; Jowers v. Commercial Union Ins. Co., 435 So.2d 575 (La.App. 3rd Cir. 1983).
To these principles must be added the corollary principle that the manufacturer of a product, for purposes of products liability, includes not only the original manufacturer, but also any entity that substantially modifies or materially alters the product after its original manufacture through the use of different components or methods of assembly. Thus a corporation or other entity may be cast in product liability for product modifications that engender injury-causing defects. See Spillers v. Montgomery Ward & Co., Inc., 294 So.2d 803 (La. 1974); LeBouef v. Goodyear Tire & Rubber Co., 623 F.2d 985 (La.App. 5th Cir. 1980).
Testimony and evidence presented in the instant case concerning the cause of the accident focused on a hydraulic hoist mechanism on the dump truck which was manufactured by Heil and had been installed by Beno Truck. The hydraulic hoist raises and lowers the dump bed on the truck. A pump located behind the cab pushes hydraulic fluid into two cylinders which lift the dump bed. When the hydraulic fluid drains out, the bed is lowered. If fluid remains in the cylinders, the dump bed remains in an up position.
A mechanism was designed into the hydraulic hoist system to prevent over extension of the bed and to keep the pump from working against itself once the cylinders are extended. The mechanism consists of a spool valve with a cable attached. The spool valve is able to move forward and backward. When it is in a forward position, hydraulic fluid can be pumped into the cylinders. When in a neutral position, no fluid can flow into or out of the cylinders. When the spool valve is pulled back, hydraulic fluid drains out of the cylinders and the dump bed lowers itself.
The cable that is attached to the spool valve is attached on the other end to the underside of the dump bed. When the dump bed rises, it pulls the cable which in turn pulls the spool valve into a neutral position to stop the flow of hydraulic fluid. If the cable is struck or pulled too far, it will pull the spool valve out causing the hydraulic fluid to drain and the dump bed to lower.
As the cable must run from the pump over the length of the frame to the rear of the bed, there is a risk that anyone working *1032 under the dump bed might strike the cable, causing the bed to descend. Heil provided a piece of pipe with the hydraulic mechanism along with instructions to use this pipe to guard the cable along the length of the truck frame. Of necessity, the pipe could not run all the way to the dump bed as it would be crushed when the bed is lowered. By design, a space had to be provided between the end of the pipe and the dump bed, leaving a section of exposed cable. Heil's instruction manual for installation of the hydraulic system contained instructions on how to install the pipe as well as warnings that some sort of blocking should be used on any raised bed to prevent it from falling when work is being performed beneath the dump bed.
Various experts testified in the case concerning the safety and utility of the spool valve-cable system. It was uncontroverted that the accident was caused by hitting the cable. The truck was not running. There were only two people in the areathe plaintiff, who was working beneath the dump bed, and R.T. Turner, who was walking away from the truck. Since Turner was able to raise the dump bed after it had crushed the plaintiff, it is obvious that the integrity of the hydraulic system was still intact. Additionally, plaintiff testified that he did not use any kind of blocking or propping device on the dump bed before he got under it to work. He did not recall touching the cable, but surmised that his arm must have come in contact with it.
Testimony also established that Heil became aware of the problem with the cable system in 1968 or 1969. By 1971, Heil began providing pipes for cable guards. The parts that were eventually placed into the truck which caused plaintiff's injuries were shipped to Beno Truck in 1974. Early in 1975, Heil also became aware that a 47¢ clamp could be installed on the cable in such a way as to prevent the spool-valve from accidentally being pulled back. On July 15, 1975, the hydraulic system was installed by Beno Truck on the truck. Heil redesigned the spool valve-cable system, incorporating the idea of the cable clamp, and began production of this new system on June 17, 1976.
A. Liability of Heil
In the instant case, knowledge of the risk is clear because Heil knew of the risk of injury to persons working beneath the dump bed if contact with the cable was made.
As indicated in the above jurisprudence, if a product has dangerous propensities (which a manufacturer is presumed to know) that render it unreasonably dangerous (defective) to normal (foreseeable) use, the manufacturer is liable if it fails to give a warning adequate to apprise the user of the specific risk of harm which may be encountered by the user during the use of the product. Quattlebaum v. Hy-Reach Equipment, 453 So.2d 578 (La.App. 1st Cir. 1984), writs denied, 458 So.2d 474, 483 (La.1984); Smith v. Formica Corporation, supra.
An adequate warning is one which, if followed, would make the product safe for the user, that is, had the injured person complied with the warning, there would have been no accident. Cf. Benoit v. Ryan Chevrolet, 428 So.2d 489 (La.App. 2nd Cir.1982). The warning must be given in such a manner that it can reasonably be brought to the attention of the user, such as placing it on the container in which the product comes, placing it on the product itself or, where appropriate, providing an instruction or operation manual. See, for example, Broussard v. Continental Oil Company, 433 So.2d 354 (La.App. 3rd Cir. 1983), writ denied, 440 So.2d 726 (La.1983); Cobb v. Insured Lloyds, 387 So.2d 13 (La. App. 3rd Cir.1980), writ denied, 394 So.2d 615 (La.1980).
There is ample evidence in the record for us to find that the hydraulic system designed and manufactured by Heil was unreasonably dangerous. The sole purpose of the cable on the hydraulic system is to protect the equipment. Its absence poses no threat to human health or life nor will its absence contribute to the *1033 catastrophic failure of the machinery. We find that its utility does not outweigh its danger. See Hunt v. City Stores, Inc., 387 So.2d 585 (La.1980).
Although Heil was aware of the problem with its equipment at least five years prior to shipping it to Beno Truck, the only warnings Heil provided as to the danger of this system were contained in its instruction manuals regarding the hydraulic system. The manual contained the following warnings:
1) Section 2 of the instruction manual dealt with general Installation Instructions. Section 2.9 of the manual provided:
VENTING OF SYSTEM
WARNING: When any work is to be done on body or hoist and body is fully or partly raised, it must be blocked securely so that it cannot fall, and disengage PTO.
WARNING: Read and study Operation section of manual before proceeding.
2) Section 4 of the manual concerned maintenance, and provided:
SAFETY PRECAUTIONS
WARNING: When any repairs or adjustments are made and body is fully or partly raised, body must be blocked securely so that it cannot fall.
3) Section 5 of the manual addressed repairs and provided:
WARNING: When any repairs or adjustments are made and body is fully or partly raised, body must be blocked securely so it cannot fall. Disengage PTO.
These warnings only caution those working under a raised dump bed to block it in an up position to prevent its descent. No warning is given as to the danger of touching the cable despite Heil's knowledge that touching the cable would bring down the dump bed. There is no question that a manufacturer with this knowledge has a duty to warn users of its product of the danger. Winterrowd v. Travelers Indem. Co., 462 So.2d 639 (La.1985). Additionally, this warning is unlikely to reach the ultimate consumer or user.
The law in Louisiana today requires that a manufacturer provide warning of any danger inherent in the normal use of its product which is not within the knowledge of an ordinary user. Chappuis v. Sears, Roebuck & Co., supra; Winterrowd, supra at p. 642.
The ordinary hydraulic system repairman would likely realize the danger of touching the cable under the dump bed of a truck. The plaintiff, however, was not a hydraulic system repairman. He was not working on the hydraulic system when he was injured. The evidence shows that he is a skilled mechanic, but has no experience with hydraulic equipment. There was no reason for him to read the Heil manual to do the work he was performing.
In its brief, Heil submits that the cable was anchored by an eyelet welded to the cross-beam where plaintiff was seated, repairing the differential gear. Testimony indicates if the pipe would have been installed, it would have ended some fifteen to sixteen inches from the eyelet. As installed, the cable began its upward angle toward the underside of the dump bed at the point it passed through the eyelet, where the ascent of the cable would have begun approximately sixteen inches further toward the rear of the truck had the pipe been installed. Heil claims this would have moved the exposed cable out of plaintiff's reach, relieving Heil from responsibility. But, the danger of moving the exposed cable still existed at the end of the truck where plaintiff was workinga danger of which plaintiff was unaware absent sufficient warning.
Clearly, Heil is liable for plaintiff's injuries for failure to warn of the danger inherent in the product it manufactured.
B. Liability of Beno Truck
When Beno Truck installed the hydraulic system in the truck which injured the plaintiff, it failed to install the pipe to guard the cable. Al Beno Cortelloni, owner of Beno Truck, testified that the pipe used *1034 to protect the cable in this hydraulic system is part of a kit sent by Heil. These tubes are a uniform length and need to be fabricated, depending upon the type of truck receiving the equipment. Cortelloni's testimony was that the tube fits 90% of the time, but that, in this instance, it did not. The expert testimony contradicted Cortelloni's assertion. Even Beno Truck's expert, Dr. Poole, testified it was possible to install the pipe.
Beno Truck strenuously contends that its failure to install the cable guard did not cause plaintiff's accident. Beno Truck reasons that even if it had installed the cable guard, plaintiff would have come in contact with the necessarily exposed cable.
We find no merit in Beno Truck's contention. There is no evidence as to the exact point at which plaintiff came in contact with the cable. However, Beno Truck was clearly negligent in not installing the cable guard and that negligence was a substantial factor in causing plaintiff's injury.
We conclude that Beno Truck knew of the dangerous propensities of the unguarded hydraulic system, that Beno Truck could have installed the safety devices sent by Heil, and that Beno Truck failed to install such safety devices. Therefore, we conclude that Beno Truck is liable to plaintiff for his injuries for its alteration of the dump truck and failure to install the safety devices.

MARSHALL'S CONTRIBUTORY NEGLIGENCE
Since we have found that Heil and Beno Truck were at fault in causing the accident, we now consider the issue of Marshall's contributory negligence.
Contributory negligence is an affirmative defense that must be specially pleaded. Defendant bears the burden of establishing the essential facts to support the plea by a preponderance of the evidence. Coleman v. Jackson, 422 So.2d 179 (La.App. 3rd Cir.1982). The negligence of a plaintiff could not constitute contributory negligence unless such negligence was the legal cause of his accident. The threshold inquiry in the determination of legal cause is whether the act was a substantial factor in causing the injury. Breithaupt v. Sellers, 390 So.2d 870 (La.1980).
With these principles in mind, we proceed to examine the evidence to determine if defendants have presented facts which reflect that Marshall was negligent and that such negligence was the legal cause of the accident.
Testimony indicated that the plaintiff was not familiar with hydraulic systems. He was not working on the hydraulic system when he was injured. Marshall had seen the truck the day before the accident and the day of the accident. On both days, the dump bed was in a raised position. Plaintiff had no reason to believe there was any danger of the dump bed descending. Being unfamiliar with hydraulic systems, there is no evidence to indicate that he was aware of the danger of touching the cable. No warnings were placed on the truck indicating the danger of touching the cable or the necessity to block or prop the dump bed. Heil provided warnings about working under a dump bed in its manual for platform conversion hoists, but there is no evidence that plaintiff either had access to the brochure or that he had ever seen the brochure. Certainly plaintiff's failure to block or prop the dump bed was a cause of his injury, but was not the proximate cause of the injury.
We recognize that the Louisiana Supreme Court in Bell v. Jet Wheel Blast, Div. of Ervin Indus., 462 So.2d 166, 167 (La.1985), recently held that "contributory negligence does not apply in strict products liability cases and that the principle of comparative fault may be applied in some products cases according to precepts formulated by analogy from the principles of Civil Code article 2323 and former article 2323, and other relevant social values, ethical principles and empirical data." This case pre-dates LSA-C.C. art. 2323 as amended by Acts 1979, No. 431, § 1 introducing the doctrine of comparative negligence to Louisiana. Consequently, the rule of law to be *1035 applied in examining plaintiff's actions, is that of contributory negligence.
In the instant case, plaintiff only alleged the liability of Heil and Beno Truck based on negligence. The Louisiana Supreme Court has already determined that contributory negligence is not a defense to a strict products liability case. See Bell v. Jet Wheel Blast, Div. of Ervin Indus., supra. We see no reason why the same rule should not apply in a negligence products liability case. However, because we find that plaintiff was not contributorily negligent, we find it unnecessary to reach this issue.

SOLIDARY OBLIGATION
Having found that both Heil and Beno Truck are liable for plaintiff's damages, we must determine whether they are solidarily liable to the plaintiff. Under LSA-C.C. art. 1796, "solidarity of obligation shall not be presumed. A solidary obligation arises from a clear expression of the parties intent or from the law." LSA-C.C. art. 1797 provides that "an obligation may be solidary though it derives from a different source for each obligor."
In the case sub judice, Heil and Beno Truck are solidarily liable for the injuries sustained by Marshall because there is an obligation on the part of each debtor and they are all obliged to the same thing. Narcise v. Illinois Central Gulf R.R. Co., 427 So.2d 1192 (La.1983); Simon v. Smith, 470 So.2d 941 (La.App. 3rd Cir. 1985). The instant case is analogous to the situation presented in Winterrowd v. Travelers Indem. Co., 462 So.2d 639 (La.1985). In Winterrowd, supra, defendant Bliss manufactured a punch press in 1907. The machine had a propensity to "double-strike," which posed an unreasonable risk on injuring the hands of the unwary operator. Even after Bliss knew of this danger, it did not attempt to warn those who owned and operated the older presses. In the meantime, defendant Rheam, a purchaser of the press, had altered the machine in such a way that the clutch and latch mechanism became misaligned. This caused the machine to double stroke and amputated the plaintiff's fingers. The Louisiana Supreme Court held Bliss and Rheam solidarily liable for the plaintiff's injuries: Bliss, for failure to warn; Rheam for its alteration of the machine.
Clearly, the fault of both Heil and Beno Truck caused plaintiff's accident, and, as a result, they are solidarily liable for plaintiff's injuries.[1]

HEIL'S PLEA OF PRESCRIPTION
On August 29, 1979, plaintiff filed this suit in the Nineteenth Judicial District Court against Beno Truck, Beno's Crane Rental, Inc., and Leasing Services, Inc. All of those defendants are Louisiana corporations. On August 31, 1979, plaintiff filed suit on this same cause of action in the U.S. District Court for the Eastern District of Louisiana, against Heil, Peabody Gallion Corporation, and Garwood Company. These defendants are foreign corporations or foreign business entities.
Heil was served with the federal suit through the Louisiana Secretary of State on September 6, 1979. Heil was named as a defendant in the state court action on September 30, 1980. Other defendants were named in the state court action subsequent to the petition being filed, and various third party demands were made by the litigants. By way of voluntary dismissals and directed verdicts, all defendants were dismissed from the state suit with the exception of Beno Truck, Heil and Hartford (the insurer for Heil).
Heil filed a motion to dismiss the federal suit on jurisdictional grounds. It alleged that Beno Truck, a Louisiana corporation, was a non-diverse indispensable party to the federal litigation. Plaintiff, through his attorney, filed a "motion for voluntary dismissal" in the federal court. On November 25, 1981, plaintiff's motion was granted, and the federal suit was dismissed.
*1036 The state court's action proceeded to a trial on the merits. The jury reached the conclusion that Heil was solely liable for plaintiff's injuries. A judgment on that verdict was signed on November 4, 1983. Heil and Hartford appealed from that judgment. Defendants Heil and Hartford filed an objection of prescription with the district court on January 9, 1984. This exception was denied by the district court on February 3, 1984. Defendants did not appeal from this denial, rather they filed a new exception of prescription in this court.
Prescription is an objection which may be raised by a peremptory exception and which may be raised by the parties at any time prior to the submission of the case at either the trial or appellate level. LSA-C.C.P. art. 927; LSA-C.C.P. art. 2163; In Re Ponchatalawa, Inc., 428 So.2d 993 (La.App. 1st Cir.1983). We do not have to consider whether the plea of prescription in the trial court was timely in that a formal pleading of this exception was submitted to this court prior to oral argument as required by LSA-C.C.P. art. 927. See Barnes v. Fireman's Fund Ins. Co., 399 So.2d 1318 (La.App. 4th Cir.1981). The plea of prescription, therefore, is properly before us and timely.
Since the accident occurred on August 31, 1978, and Heil was not brought into the state court action until September 30, 1980, the action against Heil is prescribed on its face unless validly interrupted or suspended. LSA-C.C. art. 3492. Suspension of prescription is not an issue in this case, so the only remaining issue is whether prescription was interrupted.
There are four possible ways for this prescriptive period to have been interrupted:
(1) Acknowledgement of the right of the plaintiff by the appellants, LSA-C.C. art. 3464;
(2) Institution of suit in a court of competent jurisdiction against appellants by the plaintiff, LSA-C.C. art. 3462;
(3) Institution of an action in an incompetent court or improper venue, with service of process on the appellants within the prescriptive period, LSA-C.C. art. 3462; or
(4) The interruption of prescription against a solidary obligor, LSA-C.C. art. 1977; LSA-C.C. art. 3503.
We have previously determined that Heil and Beno Truck are solidarily liable for plaintiff's injuries; therefore, plaintiff's timely suit against Beno Truck on August 29, 1979, interrupted the running of prescription as to Heil. Hoefly v. Government Employees Ins. Co., 418 So.2d 575 (La.1982). Accordingly, there is no merit to Heil's plea of prescription.

HEIL'S THIRD PARTY DEMAND
Heil and Beno Truck filed third party claims against one another claiming that each is liable for plaintiff's injuries, and in the alternative, if both were found liable, each prayed for indemnity and contribution. The jury found that only Heil was liable for plaintiff's injuries. Although plaintiff did not appeal or answer the appeal, Heil appealed the finding that Beno was not liable for plaintiff's injuries.
LSA-C.C. art. 1805 provides:
A party sued on an obligation that would be solidary if it exists may seek to enforce contribution against any solidary co-obligor by making him a third party defendant according to the rules of procedure, whether or not that third party has been initially sued, and whether the party seeking to enforce contribution admits or denies liability on the obligation alleged by plaintiff.
Clearly, where two persons are sued as solidary obligors, and the plaintiff takes no appeal from a judgment which dismisses the suit as to one defendant and condemns the other, an appeal by the latter brings the discharged defendant before the appellate court, and, for the purposes of the third party demand, the litigation may be continued against him as though an appeal from the judgment of dismissal had been taken by the plaintiff. Wheat v. Ford, Bacon, and Davis Construction Corporation, 414 So.2d 823 (La.App. 1st Cir.1982); *1037 Vidrine v. Simoneaux, 145 So.2d 400 (La. App. 3rd Cir.1962). See also Emmons v. Agricultural Insurance Co., 158 So.2d 594 (La.1963).
In the case sub judice, Beno Truck is liable for contribution to Heil as a solidary obligor. However, we cannot render a judgment against Beno Truck directly in favor of plaintiff, since his failure to perfect a separate appeal against Beno Truck has allowed the trial court judgment dismissing Beno Truck to become final against him.

QUANTUM
The only issue remaining is quantum.
Plaintiff, a 22 year old man, was injured on August 31, 1978, when he was crushed by the bed of a dump truck. He was immediately rendered unconscious. Upon arriving at Doctors Memorial Hospital in Baton Rouge, Louisiana, he was in moderate distress, had a large abrasion and swelling in his right shoulder, had broken blood vessels in his face and eyes, and was experiencing difficulty breathing. He also complained of injuries to his lower back. Plaintiff was in intensive care for five days where he was placed on an apparatus to assist his breathing. When his cardiac and pulmonary status had stablized, he was moved out of intensive care but remained hospitalized for a few more days.
A complete examination of plaintiff after his admittance to the hospital for emergency care revealed he had also suffered a lung contusion, a rib fracture, and compression fractures of the spine. The compression fractures were at the thoraco-lumbar junction, the region of the spine at the end of the rib cage. Plaintiff also had a major deformity of the first lumbar vertebra. There was a gross wasting of plaintiff's right deltoid and pectoralis major muscles. Secondary to the fractured vertebra, plaintiff developed a thoraco-lumbar kyphosis (an abnormal spine curvature known as "round back deformity"). Upon his discharge from Doctors Hospital on September 8, 1978, plaintiff was sent home. Dr. William Hagemann continued to treat plaintiff through May, 1979. Dr. Hagemann prescribed numerous braces and body jackets which plaintiff wore throughout Dr. Hagemann's treatment, as well as other conservative treatments, like medication and physical therapy.
Dr. Hagemann referred plaintiff to Dr. S.H. LaRocca on May 21, 1979. Dr. LaRocca hospitalized plaintiff on July 5, 1979, at Touro Infirmary. At that time, plaintiff underwent a myelogram, which demonstrated defects at the T-12 and L-1 levels, which proved to be consistent with the deformity of the spinal canal. Plaintiff was also diagnosed as having a neurogenic bladder. Dr. LaRocca treated plaintiff conservatively with medication and braces.
On February 27, 1980, plaintiff underwent surgery at Touro Infirmary for the removal of the deformed vertebra at the L-1 level, along with the removal of the deranged discs above and below it. Dr. LaRocca then performed a bone graft to secure the fusion. Plaintiff remained hospitalized for twelve days.
Dr. LaRocca continued to treat plaintiff after his release from the hospital. Plaintiff wore a plastic body cast for six months and progressed well, however, he still had complaints of neck pain. Despite his progess, a second operation was performed 18 months later (on June 10, 1981) to supplement and stabilize the first bone graft. This hospitalization lasted nine days. He again was fitted with another brace. Dr. LaRocca determined that this region has since stablized and nothing further can be surgically done to help plaintiff in the area of his lumbar spine.
Additional surgery was performed at the Touro Infirmary on the cervical spine on June 17, 1982. Two discs, the C5-6 and the C6-7 were found to be degenerate and were removed. A bone graft was performed after the removal of the discs. Plaintiff was hospitalized for seven days with this operation.
At the time of trial, medical testimony indicated plaintiff was still experiencing pain in his mid back region, which has *1038 caused problems in plaintiff's performance of normal activities. His neck pain was reportedly better. No further surgery was required for plaintiff's back and neck. Damage to the shoulder, however, involved a nerve which will permanently prevent the two injured muscles from functioning and, as a result, plaintiff will never be able to move his shoulder. Disability was placed at 45% permanent disability of the whole body.
The medical testimony indicated that physical therapy and treatment of unknown duration will be required. Plaintiff was also advised to seek treatment at a pain clinic to help cope with his constant pain. The results of such treatment, however, are uncertain.
Dr. William P. Culbertson, Jr., an expert in economics, testified that plaintiff had a work life expectancy of 39.3 years. Dr. Culbertson calculated plaintiff's past lost wages at $126,163.00. Considering plaintiff's wages and normal working hours at the time of the accident and discounting future wages, Dr. Culbertson calculated future lost wages at $709,260.00, assuming twelve hours per week in overtime (normal) or $606,000.00, assuming eight hours per week in overtime (which had occurred before).
Dr. Kenneth J. Boudreaux, presented by Beno Truck as an expert in economics, testified that plaintiff on the date of the accident had a work life expectancy of 35.83 years, but that since five years had passed since the date of the accident, the remaining work life expectancy would be 30.68. Considering plaintiff's wages and weekly hours, Dr. Boudreaux calculated Marshall's wages lost since the accident to be $76,960.00 and his future lost wages to be between $251,323.00 and $340,384.00. This calculation was based on the idea that Marshall could no longer engage in any gainful occupation for wages. Dr. Boudreaux was of the opinion that, if plaintiff were capable of earning minimum wage, then his future lost wages would be between $172,198.00 and $232,808.00. However, Dr. Boudreaux did admit that his calculations reflected after tax income while Dr. Culbertson's calculations reflected before tax income.
Dr. Cornelius E. Gorman, plaintiff's vocational counselor, testified that considering plaintiff's physical condition, education abilities and intellectual capacity, plaintiff was unemployable at the time of trial. This determination was based on interviews and testing focused at determining plaintiff's resourcefulness, stability, initiative, drive, anxiety level, work habits, ability to work with others, ability to take direction and motivation. Dr. Gorman also found plaintiff to be introverted, with a "fair academic comfort scale." Marshall had a ninth grade education so Dr. Gorman determined that he would need to work on his literacy level by pursuing a high school equivalency diploma through adult education. Even assuming plaintiff could do this, all factors considered, including his physical condition, Dr. Gorman was of the opinion that plaintiff would remain a poor candidate for employment.
Jennifer Palmer, Heil's expert in rehabilitation, testified as to sedentary and light duty jobs available in the general area of plaintiff's home. Ms. Palmer had never seen plaintiff, but based her testimony on his physical condition according to the reports of plaintiff's physicians. She could only testify as to the availability of jobs and not on plaintiff's ability to perform any of these jobs.
The parties stipulated that plaintiff's medical expenses totalled $42,000.00. The testimony also clearly reflects that plaintiff had past lost wages of $126,163.00. The record also establishes that plaintiff's future lost wages total $709,260.00. Considering the extent of plaintiff's injuries and the treatment, as well as his continued pain and disability, all of which have been set forth in great detail above, we find a general damage award of $272,577.00 is justified.
Therefore, in light of all of the testimony medical, economic, and vocationalwe find that plaintiff is entitled to the award of $1,150,000.00 for damages which was awarded by the jury.

*1039 DECREE
For the foregoing reasons, the judgment of the trial court in favor of Marshall against Heil and Hartford is affirmed. The judgment dismissing the third party demand of Heil and Hartford against Beno and Travelers is reversed and judgment is rendered in favor of Heil and Hartford against Beno and Travelers for contribution of one-half of all sums for which Heil and Hartford are cast, provided, however, Travelers' liability for the principal of the judgment cannot exceed its policy limits of $100,000 and Travelers' liability for legal interest cannot exceed such interest on the amount of its principal exposure from date of judicial demand until paid and such interest on the excess of this judgment from the date of this judgment until paid. Section II(A)(5)(a) of Travelers' policy; O'Donnell v. Fidelity General Insurance Company, 344 So.2d 91 (La.App. 3rd Cir.1977) and the cases cited therein. Heil, Hartford, Beno and Travelers are cast for the cost of this appeal.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART.
LANIER, J., concurs in the result.
PER CURIAM.
Although not an issue on this appeal, it has been called to our attention, and all parties in interest agree, that intervenor Maryland Casualty Company is not entitled to interest from the date each compensation benefit was paid insofar as those benefits paid prior to judicial demand (intervention) and the judgment of the trial court is amended to provide:
IT IS FURTHER, ORDERED, ADJUDGED AND DECREED that there be judgment herein by preference and priority in favor of intervenor, Maryland Casualty Company, and against defendant, The Heil Company, for compensation and medical benefits paid to or in behalf of Milton Marshall in the amount of SEVENTY-SEVEN THOUSAND SIX HUNDRED SIXTY-FIVE AND 27/100 ($77,665.27) DOLLARS paid from August 1, 1978 through and including October 13, 1983 at the rate of ONE HUNDRED THIRTY AND 00/100 ($130.00) DOLLARS per week with interest from the date of judicial demand for those payments made prior to date of judicial demand, the filing of the intervention. For those compensation payments and medical benefits paid subsequent to the date of judicial demand, the date of the filing of the intervention, there be interest from the date each compensation or medical payment was made; the interest on all payments to run until judgment is paid; and,
IT IS ORDERED, ADJUDGED AND DECREED that at the time judgment is paid, the aforementioned amount shall be revised upward to include those additional amounts paid to or in behalf of Milton Marshall at the rate of ONE HUNDRED THIRTY AND 00/100 ($130.00) DOLLARS per week compensation in addition to any additional medical payments, all with interest until judgment is paid.
NOTES
[1] Defendants, Heil and Hartford, also filed an exception of prescription with the district court subsequent to the trial. The trial court overruled the exception of prescription. Defendants did not appeal this ruling of the trial court. Instead, they filed a new exception of prescription with this court.
[2] In so ruling, the trial judge relied on this court's holding in Lawes v. State Farm Mutual Auto. Ins. Co., 387 So.2d 1200 (La.App. 1st Cir. 1980). At the time of trial, Lawes was good law and permitted the introduction of evidence as to the inability of a co-defendant to respond in damages. Rodriguez v. Traylor overrules Lawes.
[3] We deem it inappropriate to address appellants other assignments of error because the new trial and resulting judgment may obviate all or part of the errors assigned.
[1] See discussion on Heil's third party demand.